UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------

ROSEMARY DAVIS,

                          Petitioner,

    v.                                                     No. 07-CV-1099
                                                          (NAM/DRH)

WILLIAM POWERS, Superintendent,

                          Respondent.

----------------------------------------------------------------

**APPEARANCES:**                             **OF COUNSEL:**

ROSEMARY DAVIS
Petitioner Pro Se
No. 05-G-0041
Albion Correctional Facility
3595 State School Road
Albion, New York 14411

HON. ANDREW M. CUOMO             ALYSON J. GILL, ESQ.
Attorney General for the State            THOMAS B. LITSKY, ESQ.
  of New York                                  Assistant Attorneys General
120 Broadway
New York, New York 10271

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

      Petitioner pro se Rosemary Davis ("Davis") is currently an inmate in the custody of the New York State Department of Correctional Services ("DOCS") at Albion Correctional Facility. Pet. (Docket No. 1) at 2. On January 11, 2005, a jury in Oneida County convicted Davis of manslaughter in the second degree, and the Oneida County Court sentenced her

---

      [1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.4.

to an indeterminate prison term of five to fifteen years. T4: 124–25; S: 11.[2] Davis now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that:

1) There was insufficient evidence to support the Davis' conviction for second-degree manslaughter;

2) The trial court abused its discretion by improperly admitting autopsy photographs that were unduly prejudicial to Davis, thereby denying her a fair trial; and

3) Davis' sentence of five to fifteen years was harsh and excessive.

Pet. at 5–6. For the reasons that follow, it is recommended that the petition be denied.

## I. Background

On the morning of May 27, 2004, Erickyzha, then twenty-two months old, resided with Davis, her legal guardian.[3] Davis asked Bobby Noid, a friend, to watch Erickyzha while she was in the bath. T2: 115–16, 148–50. From the kitchen, Noid checked on Erickyzha and saw her playing in the water, but, thinking that Davis had returned, he left the room. T2: 116–118. Realizing that Noid was no longer watching Erickyzha, Davis returned to the bathroom and found Erickyzha in the bathtub unconscious and not breathing. T3: 215–16. According to Davis, the water in the bath was extremely hot. T3:

---

[2] "T" followed by numbers refers to the volume number of the trial transcript and the internal page numbers thereof. Docket No. 11. "S" followed by a number refers to the page numbers of the sentencing transcript. Docket No. 11.

[3] On August 12, 2003, Erickyzha was removed from her mother's care and placed in Davis' care by the Oneida County Department of Social Services. T2: 10–11. The following day, Erickyzha was placed in Davis' legal custody by order of the Family Court. T2: 21–22. At the time in question, Davis also had custody of, and resided with, Lesha Turpin ("Lesha"), then fifteen-years-old, Marcia Turpin ("Marcia"), then sixteen-years-old, James, then four-years-old, Alphonso Davis ("Alphonso"), Davis' teenage son, and Bobby Noid ("Noid"), Davis' friend of three years. T2: 25, 27–28, 107–11.

216–17.  Davis attempted to resuscitate Erickyzha, who expelled water from her lungs and regained consciousness.  T2: 119–20; T3: 217–18.  At that time, Noid noticed that Erickyzha had been badly burned on the lower half of her body—her legs, feet, vaginal area, and buttocks—and that her skin was red and started to "bubble up."  T2: 121–23.  Noid told Davis to take Erickyzha to a doctor, but Davis refused, stating that she was afraid of losing custody of her children.  T2: 123–25, 164–65.

     Between 1:30 and 2:30 p.m., Elvira Turpin, a friend of Davis' and mother of the two Turpin children in Davis' custody, arrived at Davis' house to help care for Erickyzha.  T2: 24–26, 30–31.  She observed blisters on Erickyzha's legs and feet.  T2: 34.  Davis and Turpin agreed to treat Erickyzha at home and together popped the blisters on Erickyzha's body, which they believed would drain and heal.  T2: 35–39, 56–58.  Although Turpin had taken nursing classes, she had no prior experience in treating either adult or child burn victims.  T2: 60–61, 68–69.  Later that day, Craig Loomis, Davis' landlord, came to her home where he discovered that Erickyzha had been injured.  T3: 43–47, 52.  He observed Erickyzha lying on a bed, wrapped in gauze, but not moving.  T3: 45.  Loomis asked Davis if she had brought Erickyzha to the emergency room, and Davis falsely responded that she had.  T3: 45–46.

     When Marcia, Davis' foster child, arrived home from school, she observed Erickyzha lying down, not crying or moving, with her legs wrapped in bandages.  T2: 91–94.  Marcia told Helen, Davis' daughter who was at the house, that Erickyzha should go to the hospital.  T2: 95.  Helen then suggested to her mother that Erickyzha should go to the hospital, but Davis refused stating that she was afraid Marcia, Lesha, and James would be taken away.  T2: 95–97.  When Marcia returned to school the next day, she

asked her teacher if there were any creams that could help burns and if someone could die from a bad burn. T2: 97–100; T3: 38–40. Davis and Turpin continued to care for Erickyzha over the next few days. T2: 37–39, 42–43, T3: 228–235. Turpin observed Erickyzha's skin beginning to exhibit a green tint, but that she removed the discoloration with peroxide. T2: 44, 71–72.

On May 31, 2004, Erickyzha was unable to walk and refused to eat and drink. T2: 46–49. Turpin observed that her eyes "did not look right" and that she appeared to be losing consciousness. T2: 49. Davis called 911. T3: 233–34. When an ambulance arrived, Noid falsely told paramedic Jeffrey Carroll that Erickyzha had been burned that day, rather than four days earlier. T2: 144–47, 152–53. Erickyzha was carried out of the house by Captain James Barefoot, a fireman, who noticed that she was very cold. T2: 186–87. In the ambulance, Erickyzha was not able to breathe, and her heart did not beat on its own. T2: 197. Dr. Christopher Max, a trauma surgeon that received Erickyzha at the hospital, observed that Erickyzha was in a state of shock and that her body temperature was 82°. T3: 13, 21, 24–26. He spent twenty-five minutes attempting to resuscitate Erickyzha before declaring her dead. T3: 16–17.

Dr. Max observed that Erickyzha's burns were so severe that much of her skin was gone and what remained could no longer maintain her body's temperature. T3: 13, 15, 20–21. It would have been necessary for Erickyzha to be treated at a burn center where the dead skin tissue would be removed, skin grafts would be applied, and antibiotics would be administered to ward off infection. T3: 21–23. Erickyzha would have received pain medication because the pain would have been severe, especially when her dressings were changed. T3: 23. Dr. Max opined that when a child sustains injuries as severe as

4

Erickyzha's, it would be apparent to a care giver that the child needs immediate medical attention. T3: 35.

Dr. Sikirica, the physician that performed the autopsy, declared the ultimate cause of Erickyzha's death to be sepsis, a poisoning of the blood and subsequent circulatory collapse, which led to cardiac arrest. T3: 192. Dr. Sikirica opined that he believed that Erickyzha would have been very ill, in severe pain, and possibly in shock. T3: 191–92. Due to the severity of her injuries, there was no medical attention Erickyzha could have received at home that would have minimized the risk of her death. T3: 199–200. It would have been immediately apparent to anyone who looked at Erickyzha's injuries that she needed medical care. T3: 190–91, 204. Furthermore, if Erickyzha had been brought to the hospital immediately after she had been burned, she would have had a very good chance of surviving, and that the lack of medical care was "indirectly responsible for her death." T3: 192–93.

At approximately 2:00p.m. on May 31, Police Officer Patrick Dodge arrived at Davis' home to further investigate Erickyzha's injuries. T2: 204. Davis falsely told Dodge that Erickyzha had been burned that day. T2: 206–07. Turpin and Noid also corroborated this account. T2: 207. Later, Davis took Sergeant Grace Pruitt of the Utica Police Department into the house and showed her the bathtub where Erickyzha was burned. T2: 208. Dodge observed that the tub was completely dry. T2: 208. After learning that Erickyzha had died, Pruitt questioned Davis about her the incident. T3: 114–15. In her first written statement, Davis again stated that Erickyzha had been injured that day rather than four days earlier and that she called 911 immediately after discovering that Erickyzha had been injured. T3: 127–32. Davis also stated that Erickyzha had a small burn on her buttocks

since May 28, that Loomis had seen it, but that it did not require medical attention. T3: 131–32.

Based on statements from other witnesses, Pruitt deduced that Erickyzha was not burned on May 31 as Davis claimed. T3: 132–33. Pruitt discussed this with Davis, who then agreed to revise her statement. T3: 133–34. In this second written statement, Davis falsely claimed that Erickyzha was burned on May 28 rather May 27 and that she did not take Erickyzha to the hospital because she was afraid she would be blamed for burning her. T3: 137–41. Also in this second statement, Davis admitted that she realized Erickyzha had been "burned bad on her legs and butt" and that she "thought that [she] should get [Erickyzha] help, but [she] was too afraid." T3: 140.

On June 3, 2004, Davis gave her third and final written statement to Peter Scalise, an investigator with the Oneida Count District Attorney's Office. T3: 101–03, 148–53. In this statement, Davis finally admitted that Erickyzha was burned on May 27. T3: 148. Although she stated that she knew that Erickyzha was badly burned on her buttocks, legs, and vagina, she claimed that she did not think Erickyzha was going to die. T3: 148, 150–51, 153. Davis also admitted that she did not take Erickyzha to the hospital because she though it "would look bad on [her]." T3: 151.

Davis was arrested, indicted, convicted, and sentenced as indicated above. Davis' appeal was denied. Docket No. 11, Ex. D; People v. Davis, 39 A.D.3d 1241 (4th Dep't 2007). Leave to appeal to the New York Court of Appeals was denied on July 25, 2007. Docket No. 11, Ex. F; People v. Davis, 9 N.Y.3d 864 (2007). This action followed.

## II.  Discussion[4]

### A.  Insufficiency of Evidence

Davis contends that the evidence was insufficient to support a conviction for manslaughter in the second degree.  Pet. at 15 (Docket No. 1).  A habeas petitioner who claims that the evidence was not sufficient to sustain a conviction bears a "very heavy burden."  United States v. Pierce, 224 F.3d 158, 164 (2d Cir. 2000).  Generally, issues related to the weight of the evidence and the credibility of the witnesses are determinations for the jury and are not grounds for reversal.  United States v. Vasquez, 267 F.3d 79, 91 (2d Cir. 2001); Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).  "[T]he critical inquiry on review of the sufficiency of evidence . . . [is] whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318 (1979).  The court must determine if, "after viewing the evidence in the light most favorable to the prosecution . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Under this rigorous standard, the court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must

---

[4] Respondent argues that Davis' claim regarding the admissibility of the autopsy photographs is unexhausted because she relied solely upon state court cases in her appeal to the Appellate Division and, therefore, failed to raise the issue as a federal constitutional claim.  Ex. A, Docket No. 11; 28 U.S.C. §§ 2254(b)(1)(A) & (c); Picard v. Connor, 404 U.S. 270, 275 (1971); Aparicio v. Artuz, 269 F.3d 78, 89 (2d Cir. 2001).  Even though this claim is unexhausted and Davis is in procedural default, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") allows the writ to be "denied on the merits, notwithstanding the failure . . . to exhaust."  28 U.S.C. § 2254(b)(2).  Thus, Davis' admissibility of evidence claim may be addressed despite being procedurally precluded.  Because Davis' claim is meritless for the reasons discussed below, respondent's procedural default contentions need not be addressed.

defer to that resolution." Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 326).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999)). Pursuant to New York law, manslaughter in the second degree requires a showing that the defendant recklessly caused the death of the victim. N.Y. Penal Law § 125.15. A defendant acts recklessly in causing the death of another when he or she engages in conduct that "involve[s] a 'substantial and unjustifiable risk' of death and constitute[s] 'a gross deviation from the standard of conduct or care that a reasonable person would observe in the situation.'" People v. Montanez, 41 N.Y.3d 53, 56 (1976). The defendant must be "aware of the grave risk of death and act[] in disregard of it." Id.

The Appellate Division rejected Davis' claim on appeal, holding that "the conviction [was] supported by legally sufficient evidence and the verdict [was] not against the weight of the evidence." People v. Davis, 39 A.D.3d at 1242. There is no reason to question this conclusion because, as the Appellate Division found, there was sufficient evidence for a rational trier of fact to find that Davis acted recklessly.

First, there was substantial evidence that Davis was aware of the risk of Erickyzha's death. Given the extent of Erickyzha's injuries and the manner in which she sustained them, Davis' awareness of the need for immediate medical care can reasonably be inferred. Erickyzha sustained her injuries by drowning in scalding hot water.[5] T3: 216–17.

---

[5] The record indicates that, at the time Erickyzha was injured, the bath water was approximately 157°. T3: 97–98.

Davis herself testified that before resuscitating Erickyzha, she believed Erickyzha was dead. T3: 217. Moreover, everyone who observed Erickyzha before her death recognized the severity of the burns she sustained. Noid saw burns on Erickyzha's legs, feet, vaginal area, and buttocks, and testified that her skin appeared red and had started to bubble. T2: 119–23. Turpin saw blisters on her legs and feet. T2: 34. Erickyzha's burns were sufficiently severe to make even sixteen-year-old Marcia aware of a risk of death; Marcia was concerned enough to ask her teacher if someone could die from a bad burn. T3: 38–40. Turpin testified that Erickyzha's skin began exhibiting a greenish tint, which Dr. Sikirica identified as gangrene. T2: 44, 71–72; T3: 201–03.

Additionally, based upon the conversations Davis had with friends and family, it was reasonable for a juror to conclude Davis was aware of the seriousness of Erickyzha's injuries and probable risk of death. Despite Davis' constant refusals, she was given numerous suggestions that Erickyzha's injuries were severe enough to warrant immediate medical attention. Directly following Erickyzha's injuries, Davis rebuffed Noid's suggestions that Erickyzha should go to the hospital. T2: 123–25. Later, both Turpin and Noid suggested taking Erickyzha to the hospital because she was losing more skin from her legs. T2: 37–39, 59–60, 137–38. Davis rejected the idea for fear of losing custody of her other children and coming under investigation by the state. T2: 37–39, 59–60, 136–37. Loomis returned to Davis' home on May 29 still under the impression that Erickyzha had received medical attention, and, upon learning that Erickyzha was still not walking, he told Davis to take her back to the emergency room. T3: 48–50, 55–56. Davis responded that she would but never did. T3: 49–50, 55–56. Later that weekend, Turpin again suggested bringing Erickyzha to the hospital because her skin was white and

coming off her legs, but Davis again refused.  T2:  43–45.  Helen again urged Davis to call 911, but Davis refused and told her "[n]o, we'll take care of the child here."  T2: 104–06.  Given the number of suggestions that medical treatment was necessary and Davis' consistent refusal, it would be clear to a rational juror that Davis was aware of the risk that Erickyzha's injuries might be fatal and that she refused to seek medical attention, not because of a lack of awareness, but due to her fear of losing custody of her other children.

Second, Davis' conduct in failing to provide immediate medical care created a risk of death.  At trial, Dr. Sikirica's testified that, due to the severity of Erickyzha's injuries, there was no treatment she could have received at home that would have reduced the risk of her death.  T3: 199–200.  He also explained that if Erickyzha had been brought to the hospital immediately after sustaining the injuries, her chances of survival "would have been very good."  T3: 192–93.

Third, a rational juror could have found that Davis consciously disregarded the risk of death in light of the evidence that Davis repeatedly lied about the medical care Erickyzha had been provided and the actual date Erickyzha was burned.  On May 27, when Loomis asked Davis if she had brought Erickyzha to the emergency room, Davis falsely replied that she had.  T3:  43–46.  On two occasions, Davis provided false information in sworn written statements taken by Sgt. Pruitt.  T3: 127–32, 138–41.  On May 31, in her first sworn statement, Davis told Pruitt that Erickyzha was injured that day (May 31), revived with CPR, and treated by paramedics immediately.  T3:  127.  Later on May 31, Davis again lied to Pruitt in a second written statement, stating that Erickyzha was burned on Friday, May 28. T3:  138.  Davis was finally truthful about the date Erickyzha

was injured in her third and final written statement to Officer Scalise, taken on June 3, where she stated that Erickyzha was burned on Thursday May 27.[6]  T3: 148.  Also, it was reasonable for a rational juror to find that Davis consciously disregarded the risk of Erickyzha's death by, as discussed above, persistently refusing numerous suggestions that she should seek medical care.

Finally, Davis' trial testimony was contrary to the testimony of several witnesses for the prosecution, calling into question her credibility.  As discussed above, a habeas court must  defer to the trial court's determination unless said determination cannot be rationally supported.  Additionally, when presented with a record containing contradictory facts, the reviewing court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 326.  By its verdict finding Davis guilty of second degree manslaughter, the jury found that Davis acted recklessly.  T4: 124–25.  Thus, this court's role is to "examine the proof to see whether that ultimate fact can be drawn from the historic facts found in the record."  Mallette v. Scully, 752 F.2d 26, 32 (2d Cir. 1984).

At trial, Davis testified that Erickyzha was in good health, laughing, playing, eating and drinking, until May 31, the day she died.  T3: 228–31.  However, Drs. Sikirica and Max provided their expert opinions of how Erickyzha injuries would have effected her.  T3: 20–23, 191–92.  Dr. Max testified that Erickyzha's body would have been unable to

---

[6]In her third statement, Davis asserted that she was unsure of the date Erickyzha was actually injured, but "it was the day before [her] landlord and son got into an argument and the landlord called the cops." T3: 148.  Officer Dodge testified that he responded to a call regarding a heated argument between Loomis and one of Davis' sons at Davis' home on Friday, May 28.  T2: 209-11.

maintain fluids or a sufficient body temperature and that she would have been in extreme pain, especially when her dressings were changed. T3: 20–23. Similarly, Dr. Sikirica testified that Erickyzha would have been very ill, in severe pain, and possibly in shock. T3: 191–92. This testimony indicate that Davis' description of Erickyzha's behavior was impossible.

Davis' also testified that it was Turpin and not herself who repeatedly rejected the suggestions that Erickyzha should receive medical attention and that, due to her learning disability, she did not fully comprehend what Turpin was saying. T3: 219–20, 260–63. However, Turpin testified that on the day Erickyzha was injured, she suggested to Davis that they should take her to a hospital, to which Davis replied "no . . . we can do this." T2: 37–39. Similarly, Noid testified that he suggested taking Erickyzha to the doctor and that Davis refused for fear of "losing her papers." T2: 123–25. Additionally, Loomis testified that, despite Davis' contrary contentions, she told him Erickyzha had received medical attention. T3: 263–64, 45–47.

Finally, Davis denied lying in her written statement about the date Erickyzha was injured, claiming that she did not understand Pruitt's questions. T3: 236–38, 272–82. However, on both occasions that Pruitt questioned Davis and prepared a written statement, Pruitt read Davis' statements out loud to her to confirm their accuracy. T3: 122–24, 134–36. After hearing each statement read aloud, Davis swore to their truth. T3: 122–24, 134–36.

Although Davis' testimony indicates that she was not aware of the risk of Erickyzha's death, by finding Davis guilty of second degree manslaughter, the jury found that she was. T4: 124–25. The jury determined that Davis' testimony was not credible,

and this Court "must defer to that resolution." Wheel, 34 F.3d at 66. In light of the overwhelming evidence and the presumption that the jury's credibility determinations rendered after viewing the testimony were warranted, there was sufficient evidence for a rational juror to conclude that Davis acted recklessly.

Davis' petition should be denied on this ground.

### B. Admission of Photographic Evidence

Davis claims that she was denied a fair trial because the trial court improperly admitted fourteen autopsy photographs depicting Erickyzha's injuries. Pet. at 5. At trial, the prosecution introduced the fourteen autopsy photographs and questioned Dr. Sikirica about the significance of each phot in relation to his forensic interpretations. T3: 169–175, 177–193. The Appellate Division held that the autopsy photographs were properly admitted because they "establish[ed Davis'] awareness of the risk that the victim would die without proper medical care," since they depicted "the serious nature of the injuries sustained . . . and the fact that her wounds were visibly infected." People v. Davis, 39 A.D.2d at 1242.

"Generally, evidentiary issues do not present federal questions or implicate the Federal Constitution." Benjamin v. Greiner, 296 F. Supp. 2d 321, 332 (E.D.N.Y. 2003) ("Federal habeas corpus relief does not lie for mere errors of state law."). However, a Federal court may review a state court evidentiary ruling if it "so infused the trial with unfairness as to deny due process of law." Estelle v. McGuire, 502 U.S. 62, 68, 75 (1992). Habeas review of erroneous state court rulings is proper only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson,

507 U.S. 619, 637 (1993).  Moreover, it is well settled that habeas relief is improper where "graphic photographs admitted at trial bore some relevance to the issues being tried." Morris v. Phillips, No. CV-04-4597 (FB), 2006 WL 3694545, at *2 (E.D.N.Y. Dec. 13, 2006); see also, Benjamin, 296 F. Supp. 2d at 332; Sides v. Senkowski, 281 F. Supp. 2d 649, 655 (W.D.N.Y. 2003).

"Under New York Law, the trial judge has broad discretion in determining the admissibility of photograph[ic evidence]."  Mance v. Fischer, No. 01-CV-11394 (PAC) (RLE), 2007 WL 2403163, at *3 (S.D.N.Y. Aug. 22, 2007) (quoting Rivera v. Scully, No. 92-CV-6659 (MBM), 1993 WL 454209, at *4 (S.D.N.Y. Nov. 2, 1993)).  Photographs are generally admissible if the tend to prove or disprove some material fact in issue, even if they "portray a gruesome spectacle."  Benjamin, 296 F. Supp. 2d at 332 (citing People v. Pobliner, 32 N.Y.2d 356, 369–70 (1973). This discretion is so broad that exclusion is required only where a photograph's "sole purpose is to prejudice the defendant."  Id. at 368–70.

In the instant case, the photographs were relevant to determine whether Davis' conduct amounted to recklessness, the mental state necessary for second degree manslaughter.  The autopsy photographs served to illustrate the extent and severity of Erickyzha's injuries.  T3: 98–100, 169–77.  The photographs depicted burns that extended from Erickyzha's feet to her abdomen.  T3: 169–77.  They show that Erickyzha had lost a considerable amount of skin and that much of Erickyzha's remaining skin exhibited a strong green color.  T3: 169–77.  With these photographs, the prosecution sought to prove that it was obvious that Erickyzha's injuries were life-threatening and required immediate medical attention, and thereby convince the jury to conclude that Davis' conduct

14

constituted recklessness.[7]  Admitting the photographs was not error because the photographs were relevant to Davis' mental state.

Even assuming admission was in error, it is not an error that warrants habeas relief. See Benjamin, 296 F. Supp. 2d at 332 ("[E]ven an error of constitutional dimensions will merit habeas corpus relief only if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'").  As discussed above, the prosecution provided substantial evidence that Davis acted in reckless disregard of the risk of Erickyzha's death, which likely would have persuaded the jury absent the photographs.  Thus, the trial court's decision to admit them does not warrant habeas relief.

Therefore, the petition should be denied on this ground.

### C. Harsh and Excessive Sentence

Davis contends that her sentence of five to fifteen years was harsh and excessive. Pet. at 6.  The Eighth Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment and prohibits the infliction of "cruel and unusual punishments."  U.S. Const. Amend. VIII; Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433–34 (2001).  Relief under 28 U.S.C. § 2254 is available to correct constitutional errors or violations of federal law, thus limiting review to determinations of whether convictions violate the Constitution, laws, or treaties of the

---

[7]As discussed above, under New York law, recklessness means conduct that creates "a 'substantial and unjustifiable risk' of death and constitute[s] 'a gross deviation from the standard of conduct or care that a reasonable person would observe in the situation'. . . . The defendant must be "aware of the grave risk of death and act[] in disregard of it.  People v. Montanez, 41 N.Y.3d 53, 56 (1976).  The prosecution sought to prove that Davis was aware that Erickyzha could die of her injuries and consciously disregarded that risk by failing to seek life-saving medical care.

United States. 28 U.S.C. § 2254(a) (1994); Estelle v. McGuire, 502 U.S. 62, 68 (1991). Claims arising out of state court sentences are generally not reviewable by federal habeas courts if the sentence falls within the range prescribed by statute. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); Jones v. Hollins, 884 F. Supp. 758, 761 (W.D.N.Y.1995), *aff'd*, 89 F.3d 826 (2d Cir. 1995). Where the sentence falls within the statutory limits, habeas corpus relief is only warranted where a petitioner shows that "the state court's sentencing decision was wholly devoid of discretion or amounted to an arbitrary or capricious abuse of discretion, or that an error of law resulted in the improper exercise of the sentencer's discretion and thereby deprived the petitioner of his [or her] liberty." Jones, 884 F. Supp. at 761–62 (citations omitted).

Davis was convicted of second degree manslaughter pursuant to N.Y. Penal Law § 125.15(1) and sentenced to five to fifteen years in prison. S: 11. Under New York law, manslaughter in the second degree is a class C felony, carrying a maximum sentence of fifteen years. N.Y. Penal Law §§ 125.15, 70.00(2), (3)(b). The sentence the trial court imposed fell within the range provided by New York statute and is, therefore, not subject to habeas review.

Accordingly, Davis' petition on this ground should be denied.

### III. Conclusion

For the reasons stated above, it is

**RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED**.

Furthermore, the Court finds that Davis has not made a "substantial showing of the

denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000).  Therefore, the Court recommends that no certificate of appealability should issue with respect to any of Davis' claims.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and N.D.N.Y.L.R. 72.3(a)(3).  The District Court ordinarily will refuse to consider on *de novo* review arguments, case law, and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See, e.g., Patterson-Leitch Co., v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990–91 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order**.  Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**IT IS SO ORDERED.**

Dated: April 6, 2010
       Albany, New York

_____
David R. Homer
U.S. Magistrate Judge